JAY RORTY [SBN: 135097]
Law Offices of Jay Rorty
501 Mission St., Suite 10
Santa Cruz, CA 95060
jay@rortylaw.com
Tel: 831-316-0722

Attorney for Defendant
CHRISTOPHER DOYON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER DOYON,<br><br>Defendant. | No. 11-CR-00683-BLF<br>12-CR-00426-BLF<br>22-CR-00099-BLF<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE** |

I. **INTRODUCTION**

Defendant Christopher Doyon has accepted responsibility by pleading guilty to misdemeanor counts of conspiracy to commit intentional damage to a protected computer and intentional damage to a protected computer (counts one and two of the Superseding Information in case number 11-CR-00683); failure to appear after pre-trial release (count one of the Indictment in case number 12-CR-00426); and intentional damage to a protected computer (count one of the Indictment in case number 22-CR-00099). (Plea Agreement [Dkt. 126[1]] 1–4.) Pursuant to the plea agreement, the parties agreed that the Sentencing Guidelines offense level should be calculated to reflect an adjusted offense level of 15. (Plea Agreement 12–13.) Following the plea agreement, the United States Office of Probation and Pretrial Services ("USPO") issued a Presentence Investigation Report ("PSR") wherein the USPO conducted Sentencing Guidelines calculations based on a total offense level of 15 and a criminal history

---

[1] Unless otherwise specified, all docket citations are to the docket in case number 11-CR-00683.

1

score of one (resulting in a criminal history category of I).  (PSR [Dkt. 127] ¶¶ 38, 43, Electronic Case Filing system ["ECF"] page 23.)  The PSR further determined that the applicable guideline imprisonment range is 18 months to 24 months, and the guideline range for a term of supervised release is not more than one year for counts one and two of 11-CR-00683, and not more than three years for count one of 12-CR-00426 and count one of 22-CR-00099.  (PSR ¶¶ 77, 80, ECF page 23.)  For reasons outlined in the PSR and addressed below, the PSR recommends a downward variance to a custodial sentence of time served and recommends a three-year term of supervised release, consisting of a separate one-year term for each of the counts under 11-CR-00683, and two separate three-year terms for count one of 12-CR-00426 and count one of 22-CR-00099, with all supervised-release terms to run concurrently.  (PSR ECF pages 23, 35.)  While Mr. Doyon concurs that a downward variance and a custodial sentence of time served are warranted, and he agrees that the factors cited in the PSR as the basis for its recommendation do indeed support a downward variance, he respectfully disagrees with the PSR's recommendation of a three-year term of supervised release.  For the reasons set forth below, Mr. Doyon respectfully requests that the Court impose a custodial sentence of time served, or 391 days, resulting in Mr. Doyon's immediate release from custody, and a one-year term of supervised release on all counts, to run concurrently, as the foregoing sentence is sufficient but not greater than necessary to achieve the goals of sentencing enumerated under 18 U.S.C. § 3553(a) and incorporated by reference under 18 U.S.C. § 3583(c), which provides the factors to be considered in determining the length of a term of supervised release.

**II.   PROCEDURAL HISTORY**

On September 21, 2011, Mr. Doyon was charged in the Northern District of California in case number 11-CR-00683 with the following counts: (1) conspiracy to commit intentional damage to a protected computer, in violation of 18 U.S.C. § 1030(b); and (2) intentional damage to a protected computer, aiding and abetting, in violation of 18 U.S.C. §§ 1030(a)(5)(A), (c)(4)(A)(i)(I), (c)(4)(B)(i) & 2.  On May 30, 2012, he was charged in the Northern District of California in case number 12-CR-00426 with a single count of failure to appear after pre-trial

release, in violation of 18 U.S.C. § 3146(a)(1).[2] On March 6, 2013, he was charged in the Middle District of Florida in case number 13-CR-00049 with seven counts of intentional damage to a protected computer, in violation of 18 U.S.C. §§ 1030(a)(5)(A), (b), (c)(4)(B) & 2.

On March 7, 2022, the Government filed a superseding information in case number 11-CR-00683 and charged Mr. Doyon with the following misdemeanor counts: (1) conspiracy to commit intentional damage to a protected computer, in violation of 18 U.S.C. §§ 1030(b), 1030(a)(5)(A) & (c)(4)(G)(i); and (2) intentional damage to a protected computer, in violation of 18 U.S.C. §§ 1030(a)(5)(A) & (c)(4)(G)(i). On March 9, 2022, case number 13-CR-00049 was transferred from the Middle District of Florida to the Northern District of California, where it was entered as case number 22-CR-00099, pursuant to Rule 20 of the Federal Rules of Criminal Procedure. On March 29, 2022, Mr. Doyon pled guilty to both counts of the superseding indictment in 11-CR-00683, the sole count of the indictment in 12-CR-00426, and count one of the indictment in 22-CR-00099.

### III. GUIDELINE CALCULATION AND JUDICIAL DISCRETION

    **a. This Court has discretion to impose a reasonable sentence below the calculated guideline range.**

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has made clear that district courts have discretion to consider all of the characteristics of the offender and circumstances of the offense, and to reject advisory guidelines that are not based on national sentencing data and empirical research, or that for some other reason do not provide an appropriate sentence for the individual defendant. *See Spears v. United States*, 555 U.S. 261, 265–66 (2009) (per curiam) (holding that district courts may categorically reject guidelines in mine-run cases based on a policy disagreement with the guidelines); *Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 17 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Sentencing courts must calculate and consider the guideline range as a "starting point in sentencing," but may sentence outside that range if such a sentence is reasonable in light

---

[2] On July 15, 2021, the Court issued an order relating case numbers 11-CR-00683 and 12-CR-00426, and the latter case was reassigned to the Court.

of the factors set forth under 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The district court shall not presume that a within-guideline sentence is reasonable. *Id.* at 50; *Rita*, 551 U.S. at 351.

Next, this Court must consider the pertinent § 3553(a) factors, and decide whether those factors call for a sentence outside the guidelines. *Gall*, 552 U.S. at 49–50. The sentencing judge is required "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Tadio*, 663 F.3d 1042, 1052 (9th Cir. 2011) (citing *Koon v. United States*, 518 U.S. 81, 98 (1996)). This Court may impose an out-of-guidelines sentence based on a combination of mitigating factors, including those which the advisory guidelines previously prohibited or those discouraged by the guidelines. The Court may consider all "information concerning the background, character, and conduct of [the defendant] . . . for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *Rita*, 551 U.S. at 364–65 (sentencing courts may consider all factors including age, education, mental or emotional condition, medical condition, employment history, lack of guidance as a youth, family ties, or charitable service). Sentencing courts need not and may not require "'extraordinary' circumstances to justify a sentence outside the Guidelines" and courts cannot use a proportional formula "for determining the strength of the justifications required for a specific sentence." *Gall*, 552 U.S. at 47. This Court need only find that, due to the pertinent factors, the appropriate sentence falls outside the guidelines range. *See Rita*, 551 U.S. at 351; *Nelson v. United States*, 555 U.S. 350, 351 (2009).

Finally, the over-arching directive under § 3553(a) is for sentencing courts to impose a sentence that is "sufficient, but not greater than necessary," to accomplish the purposes set forth under § 3553(a)(2). The authority of this Court to exercise its discretion to consider all the relevant factors and to grant sentences below the guidelines range has a significant impact in this case, as addressed below.

If the Court determines that a sentence outside the guideline range is justified and reasonable, then it must decide what sentence is warranted, and must adequately explain its reasoning, "to allow for meaningful appellate review and to promote the perception of fair sentencing," applying a "deferential abuse-of-discretion standard." *Gall*, 552 U.S. at 50. In *Rita*,

4

the Supreme Court acknowledged that a district court may exercise its discretion to sentence below the guidelines range, based on its own fact-finding, because "the case at hand falls outside the 'heartland,'" "the guidelines sentence itself fails properly to reflect § 3553(a) considerations," or "the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351.

In the present case, the sentencing factors under 18 U.S.C. § 3553(a)(1) and (2), and incorporated by referenced under 18 U.S.C. § 3583(c), warrant a downward variance to a custodial sentence of time served and a one-year term of supervised release for the reasons set forth below. As is also discussed below, the foregoing sentence would not contravene 18 U.S.C. § 3553(a)(6) and the need to avoid sentence disparities. If the Court agrees with the defense that an out-of-guidelines sentence is appropriate, it is respectfully requested that the Court state its reasons with particularity as required by *Gall*, to demonstrate to the appellate court the reasonableness of the sentence. *Gall*, 552 U.S. at 46, 50.

**IV.  A DOWNWARD VARIANCE TO A SENTENCE OF TIME SERVED AND ONE YEAR OF SUPERVISION IS WARRANTED GIVEN THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AND MR. DOYON'S HISTORY AND CHARACTERISTICS.**

Pursuant to 18 U.S.C. § 3553(a)(1), the Court is to consider "the nature and circumstances of the offense[s] and the history and characteristics of the defendant" in imposing its sentence. *See also* 18 U.S.C. § 3583(c) (providing that courts are to consider the factors under § 3553(a)(1) in determining the length of supervised-release terms). In this case, these factors support a custodial sentence of time served and a one-year term of supervised release. First, Mr. Doyon has accepted responsibility for all of the underlying offenses, and he is categorically renouncing any future illegal activity. The counts under case numbers 11-CR-00683 and 22-CR-00099 are based on underlying conduct involving distributed denial of service ("DDoS") and denial of service ("DoS") attacks. Mr. Doyon engaged in this conduct as part of his efforts as an activist, and as is discussed in greater detail below, Mr. Doyon has now unequivocally retired from all forms of illegal activism — including hacking and DDoS and DoS attacks.

While Mr. Doyon fully accepts the illegality of the underlying DDoS and DoS offenses and the monetary losses that these offenses caused, and he makes no attempt to minimize either,

5

it is nonetheless important to take into consideration the altruistic impetus for these offenses. As the stipulated facts demonstrate, Mr. Doyon was singularly motivated by a desire to aid the homeless and to mitigate the difficult circumstances homeless men and women face. He received no personal benefit as a result of these offenses, and they were instead carried out pursuant to Mr. Doyon's long-standing and ultimately admirable inclination to protect vulnerable and marginalized people and groups. While Mr. Doyon has now repudiated any activism on behalf of these groups that entails illegal activity, the fact that he has long wanted to help these groups is commendable, and he appreciates that it is imperative that he find a new way of doing so in the future.

It is also relevant that Mr. Doyon is now, in his own estimation, "well into the autumn of [his] life." (Letter to Ct. from Christopher Doyon, appended hereto as Exhibit A, at 11.) His physical health is deteriorating, as he has begun losing teeth, is underweight, and believes he may have cancer due to decades as a heavy cigarette smoker. (PSR ¶ 65.) He also suffers from anxiety and Post Traumatic Stress Disorder ("PTSD") as a result of the intense abuse he endured as a child, and his confinement has exacerbated the symptoms associated with these conditions. (PSR ¶ 66.) Given his current state, Mr. Doyon appreciates that his focus must be on caring for his physical health, healing from the trauma of his past, and building a different life. (*See* Exhibit A at 11–13.) He is ready to embark on a life focused on helping others through only legal and legitimate means, and on caring for his younger sister, Amy-Beth Doyon, who has been "[t]he one constant support" in Mr. Doyon's life, and who is disabled from Multiple Sclerosis and a severe car accident. (PSR ¶¶ 51, 60, 63, ECF pages 24–25; Exhibit A at 11; Letter to Ct. from Amy-Beth Doyon, appended hereto as Exhibit B, at 1–2.)

Taking into account the particular nature and circumstances of the offenses as well as Mr. Doyon's history and characteristics, the requested sentence is sufficient and appropriate, and will leave Mr. Doyon in the best possible position to build a different and better life for himself.

    **a.   Nature and Circumstances of the Offenses**

A sentence of time served and one year of supervised release is appropriate in light of the nature and circumstances of the underlying offenses.

### i. DDoS and DoS Offenses

Mr. Doyon has taken responsibility for his involvement in the DDoS and DoS offenses, and he accepts the illegality of this conduct and the monetary losses that it occasioned. However, without seeking to minimize the illegality or seriousness of the DDoS and DoS offenses, it is important to note the underlying motivation for these computer-based actions. Mr. Doyon was not motivated by his own self-interest, and he did not receive any financial benefit as a result of his involvement. Rather, the motivation for the DDoS and DoS actions was purely altruistic and was rooted in a cause that Mr. Doyon believes in wholeheartedly — that of advancing the welfare of homeless people. Specifically, and as the stipulated facts reflect, the DDoS and DoS actions were undertaken by Mr. Doyon and others to demonstrate opposition to the enforcement of the City of Santa Cruz Municipal Code § 6.36.010, which restricted camping within the City of Santa Cruz, and the City of Orlando Municipal Code § 18A.09-2, which placed restrictions on holding "large group feeding" events at Orlando's public parks and, consequently, significantly curtailed aid organizations' ability to distribute food to the homeless. (Plea Agreement 4–5, 7–8.)

For Mr. Doyon, it was deeply important to stand up for the homeless men and women of Santa Cruz and Orlando and to express solidarity with the protestors who had been charged in connection with their occupation of the Santa Cruz County Courthouse, (Plea Agreement 5), and with aid organizations like Food Not Bombs, whose members were arrested for feeding homeless people at public parks in violation of the Orlando ordinance, (Plea Agreement 7). As Mr. Doyon indicates in his letter to the Court, his commitment to aiding the homeless is informed by the teachings of Buddhism and the beliefs he holds as a practicing Buddhist. (Exhibit A at 5.) Mr. Doyon explains, writing: "Buddha taught that the homeless state, far from being a bad or disordered thing, is in fact a sacred way of life. . . . Thus, to stand up for the homeless, the hungry, the brave people from Food Not Bombs who were being arrested for feeding them . . . this is something that I was compelled to do both morally and spiritually." (Exhibit A at 5.)

The humanitarian underpinning for Mr. Doyon's actions is also reflected in Keith McHenry's letter to the Court, in which Mr. McHenry, who is a co-founder of Food Not Bombs, writes: "I believe anyone with as big a heart as Chris would be moved to respond nonviolently to

7

news that people were being arrested for sharing meals with our hungry." (Letter to Ct. from Keith McHenry, appended hereto as Exhibit C.)  Similarly, Mr. Doyon's long-time friend, Sunshine Jessica Folsom, speaks to Mr. Doyon's care and appreciation for the humanity of homeless people, writing: "[Mr. Doyon] is the kind of person who does not just walk by a homeless hungry person on the street.  Even if he has nothing himself to offer, he will stop to talk with them and listen to their story." (Letter to Ct. from Sunshine Jessica Folsom, appended hereto as Exhibit D, at 1.)

In addition to the altruistic motive that prompted the offense conduct, the Court should take into account that the DDoS and DoS actions were non-violent and were undertaken pursuant to Mr. Doyon's belief that the conduct — though illegal — was part of a proud and essential tradition of peaceful civil disobedience.  As Mr. Doyon's letter to the Court makes clear, it was paramount to him that the underlying conduct was non-violent and in accordance with the ideals and principles of civil disobedience as he understood them. (Exhibit A at 1–3.)  While it is not suggested that Mr. Doyon's perception of the DDoS and DoS actions or his humanitarian purpose negate the illegality of the offense conduct or the monetary losses that it caused, these factors are nonetheless important because they distinguish the instant DDoS and DoS offenses from acts that are wantonly criminal and without any connection to a laudable purpose and never conceived of as political acts of civil disobedience.

Given the foregoing circumstances, the requested sentence is both warranted and appropriate.

### ii. Failure to Appear

As with the DDoS and DoS offenses, Mr. Doyon appreciates the seriousness of his failure to appear and the duration of his subsequent flight, and he does not seek to downplay the gravity of either.  It is nevertheless significant that Mr. Doyon remained law-abiding throughout the entire nine-year period in which he was at large.  This is attested to by the many letters of support that have been submitted to the Court on Mr. Doyon's behalf and by the friends that he earned during the period of flight, all of whom are law-abiding individuals who are loyal to Mr. Doyon and describe his giving and generous nature.

In addition, and as the PSR and letters of support reflect, the period of flight was marked by significant hardship for Mr. Doyon. In the course of explaining the basis for the downward variance it recommends, the PSR notes that: "the defendant's time as a fugitive has not been kind to him. He lived in Canada and Mexico, never being able to stay close to his supportive sister." (PSR at ECF page 25.) The PSR also reports that Mr. Doyon was "stressed and paranoid the entire time he was on the run." (PSR ¶ 67.) Further insight is provided by the letters submitted by and on behalf of Mr. Doyon. Amy-Beth Doyon writes that Mr. Doyon "was often hungry, cold and sick" during the flight period, and she indicates that Mr. Doyon's "self-imposed exile has taken a massive toll on him physically and emotionally." (Exhibit B at 2.) Mr. Doyon's friend, Ian Thornton, who first met Mr. Doyon when he was a fugitive in Canada, reveals that Mr. Doyon was homeless during his time in Canada and that he spent seven Canadian winters sleeping outside. (Letter to Ct. from Ian Thornton, appended hereto as Exhibit E, at 1–2.) Finally, Mr. Doyon describes his mental state during his period in Mexico, writing: "I was in a very dark place in life, and frankly I was so depressed that I was a danger to myself at the time." (Exhibit A at 12.)

The fact that Mr. Doyon endured challenging circumstances throughout the period of flight supports a sentence of time served and one year of supervised release. In particular, a single year of supervision is sufficient, and the three-year period the PSR recommends is unduly long, given that Mr. Doyon demonstrated his ability to remain law-abiding and desist from any further computer-based activism during the entire nine-year period of flight.

    **b. Mr. Doyon's History and Characteristics**

        **i. Mr. Doyon's experience of physical and sexual abuse during his childhood and teen years, and of being utterly failed by the authority figures who were meant to intervene and protect him and his sister from their father and stepmother, was formative and engendered Mr. Doyon's deep-seated and lasting commitment to standing up for the vulnerable and marginalized and voicing peaceful dissent in the face of injustice.**

As the PSR details, Mr. Doyon's early childhood and teen years were marked by the intense physical, emotional, and sexual abuse that he endured at the hands of his father and

9

stepmother. (PSR ¶¶ 52–57, 61–62, 68, 97, ECF pages 24–25.) In the face of this abuse, Mr. Doyon assumed responsibility for protecting his younger sister, Amy-Beth, even as he, too, remained vulnerable. (PSR at ECF page 24 ("The defendant felt extremely protective of Amy Beth who was only weeks old when their mother died."); Exhibit B at 1 ("My brother . . . made it his life mission to protect me. . . . He loved me and protected me when no one else did.").) Mr. Doyon explained the salient impact this responsibility had on his response to the abuse, telling Probation Officer Jessica A. Goldsberry that "things were so bad at his father's house that he 'could have gone to the dark side,' but he did not because he had his sister to protect." (PSR ¶ 53.) In addition to the abuse itself, Mr. Doyon's situation was compounded by the fact that he was utterly failed by the authority figures who were charged with intervening to protect him and yet did nothing when they became aware of the abuse. (PSR ¶¶ 56, 58, 97, ECF page 24.) This did not happen a single time, but rather repeatedly, as the school bus driver and multiple police officers learned of the abuse and, instead of taking action, simply returned Mr. Doyon to the house in which the abuse was taking place. (*Id.*)

As a result of these early experiences, Mr. Doyon emerged from his childhood and teenage years having inhabited two formative roles — that of the protector of another, more vulnerable person, and that of an extremely vulnerable person who was, himself, in dire need of help and was nonetheless completely failed by those in positions of power, whose inaction and disregard for Mr. Doyon left him mired in a horrible situation. While Mr. Doyon's difficult early life might have broken him, it did not. Instead, it engendered an admirable and enduring commitment to standing up for the vulnerable and marginalized in the face of injustice and the same government and institutional apathy that Mr. Doyon experienced as a child. Appreciating the connection between Mr. Doyon's early years and the activism he went on to dedicate himself to, the PSR states: "When one looks at the disturbing series of events that made up the defendant's childhood, it is understandable that he chose a life of activism where he believed he was always standing up for the underdog." (PSR at ECF pages 24–25; *see also* PSR ¶ 63 (quoting Amy-Beth Doyon as having stated, in reference to Mr. Doyon: "His activism has to do with our childhood. He stands up for those who are helpless, animals, the elderly, the

homeless.").)  The PSR appropriately cites this dynamic as a factor that supports a downward variance, and the Court's sentence should reflect the nexus between Mr. Doyon's experience with abuse and his activism, which ultimately came to encompass the instant DDoS and DoS offenses.

    **ii. Mr. Doyon is defined by his steadfast commitment to peaceful conduct, his advocacy on behalf of those in need, and by the good heart that all of his supporters emphasize in their letters to the Court. At the same time, Mr. Doyon is tired, and wanting nothing more than a quiet life, he has categorically retired from all hacking or other forms of illegal activism.**

  A curious person and a self-taught computer programmer and hardware operator, Mr. Doyon might have devoted his life to many different endeavors, however as he explains in his letter to the Court, Mr. Doyon embarked on a "life-long mission to give a voice to the voiceless" beginning in the 1980s, when he became involved in the anti-apartheid movement and the non-violent divestiture protests calling for widespread divestment from South Africa and from companies with significant South African interests.  (PSR ¶¶ 71–72; Exhibit A at 1.)  Mr. Doyon went on to become a student of the principles of peaceful resistance and non-violent civil disobedience, and to spend more than thirty-five years employing those principles on behalf of efforts to aid those in need and advance social change.  (Exhibit A at 1, 3.)  As Mr. Doyon explains in his letter, it was as part of these efforts, and during the period of his life that he spent as an out-front activist, that Mr. Doyon joined with others in extending his activism to the cyber realm, where he would ultimately engage in the underlying DDoS and DoS offenses, but where he would also make use of the internet to simply call attention to instances of injustice.  (Exhibit A at 1; Exhibit E at 3.)

  As the letters that have been submitted to the Court attest, Mr. Doyon's impulse to help others is and always has been robust and ever-present in his activities offline, as Mr. Doyon has a great capacity for empathy and is easily moved to do whatever he can to better the circumstances of others.  This much is clear from Amy-Beth Doyon's letter, in which she describes Mr. Doyon's run for local office in South China, Maine in 2007, and recounts what she observed while accompanying Mr. Doyon on the campaign trail, writing:

> While he was campaigning I watched him get involved with the people.  I watched him go door to door, at times on foot when the

11

> only car we had was not running. I watched him take the hands of little old ladies who had no heat and not enough food. I watched him get on his knees in a suit to build a fire for a lady who was freezing in her own home. I watched him well up with tears when he heard the stories of so many people and families who needed help and were struggling. He wanted to make a difference. He wanted to help change their lives for the better.

(Exhibit B at 1–2.)

Another example of Mr. Doyon's unwavering inclination to help others and to focus his attention on the need around him rather than in his own life, is provided by Ryan Kary. Mr. Kary is also incarcerated at Santa Rita Jail ("SRJ"), and as he and Mr. Doyon are assigned to the same pod, the two men have spent "many months" "in close company" and have become friends. (Letter to Ct. from Ryan Kary, appended hereto as Exhibit F, at 1.) While in his own letter Mr. Doyon notes the frequent violence at SRJ and the hardships he has faced as his physical and mental health have declined, (Exhibit A at 5), Mr. Kary bears witness to the fact that, on the ground, Mr. Doyon has responded to these circumstances by acting as a peacemaker and offering his time, support, and commissary items to other inmates, (Exhibit F at 1). Mr. Kary writes:

> In addition to devoting his life to standing up for the voiceless and innocent, [Mr. Doyon] also truly lives what he preaches. He is a peacemaker inside the pod, regularly deescalating situations to prevent violence. He goes out of his way to help others around him, offering an open ear to those who struggle to cope with the stress brought on by incarceration or offering food or coffee to those who are hungry or less fortunate.

(Exhibit F at 1.) Mr. Kary also shares that Mr. Doyon has been a source of support to Mr. Kary, speaking with Mr. Kary about his past struggles and suggesting ways that Mr. Kary may empower himself and chart a different path upon his release. Mr. Kary speaks to what this has meant to him, writing:

> Mr. Doyon has been a positive influence for me since we've met, encouraging me to lead a better life for me and my family. Every night for months he sacrificed his evening pod time to sit one on one at the tables and educate me on ways to help in my community upon my release.

(Exhibit F at 1.)

Similar to the descriptions provided by others, Mr. Doyon's own description of the manner in which he came to own his second rescue dog, Xavier, bespeaks Mr. Doyon's propensity to step in and help when confronted with a creature in need, no matter his own limited resources. (Exhibit A at 12–13.) As Mr. Doyon's friend Ian Thornton writes: "Chris never asks for anything for himself. His DNA forces him to strive for a more just world. It is his default setting. To help others." (Exhibit E at 1.)

As significant as Mr. Doyon's activism is in that it evinces the nature of his character and his long-standing desire to act on behalf of the greater good, for purposes of the Court's sentencing determination, it is even more important that Mr. Doyon is, at this juncture, categorically ready to retire from all activism — and this includes the online activism that culminated in the underlying DDoS and DoS offenses. After suffering during his period of flight and during his incarceration, and confronting his own mortality when he contracted COVID at SRJ and became so sick he thought he would die, Mr. Doyon is resolute in his decision to stand down from activism. (PSR ¶¶ 65, 67, ECF page 25; Exhibit A at 11, 13.) Above all else, he wants to be reunited with his family and his beloved rescue dogs and lead a quiet life. (Exhibit A at 11, 13; PSR ¶ 65.) Mr. Doyon is clear about this in his letter to the Court, as he writes: "First, I want to say I am tired. Having spent 35+ years of my life as an activist, and being well into the autumn of my life, *I want nothing more than to retire from my activism. I can thus assure Your Honor that you will not be seeing me again in your courtroom*." (Exhibit A at 11 (emphasis added).) Mr. Doyon's readiness to abandon activism and pursue a different path also came across to the USPO, as the PSR includes the following conclusion: "The defendant appears remorseful for his actions and for fleeing, and he appears ready to move forward in his life and play a significant role in caring for his ailing sister." (PSR at ECF page 25.)

Further evidence of Mr. Doyon's resolve to retire from activism is provided in the letters that have been submitted to the Court, as it is readily apparent that Mr. Doyon has communicated his decision widely and that his friends, family, and supporters all believe that it is a sincere and steadfast decision. (Exhibit C ("I know that Chris can be trusted when he says his participation with cyber protesting is behind him . . . ."); Exhibit F at 2 ("I've spoken with him many long

13

hours many times and I sincerely believe him when he says he has no intention of ever causing any more trouble ever again. . . . [H]e just wishes to live the rest of his life quietly and peacefully . . . ."); Exhibit E at 2 ("[Mr. Doyon has indicated he] is now retiring.  I believe him."); Exhibit D at 1–2 ("He has no desire at his age to be a wanted fugitive on the run.  I believe him with my whole heart. . . . He realizes it is time for him to retire to a quiet life."); *see also* Exhibit B at 2.)

In addition to conveying his decision to retire from activism, Mr. Doyon has also formulated concrete plans for the new life he intends to build.  He is fortunate to have access to a stable and welcoming environment in the home of Amy-Beth, who lives in Idaho Falls, Idaho and is eager to have Mr. Doyon join her household, and Mr. Doyon would like to relocate to Idaho and live with Amy-Beth and her children.  (PSR ¶¶ 51, 60, 63, ECF page 25; Exhibit B at 2; Exhibit A at 11.)  Defense counsel is prepared to assist Mr. Doyon in seeking permission to do so, and upon Mr. Doyon's release and at the appropriate time, counsel will request that Mr. Doyon's supervision be transferred from the USPO for the Northern District of California to the USPO for the District of Idaho.  If this request is granted and Mr. Doyon is permitted to join Amy-Beth in Idaho, both siblings will benefit from being able to live together — while Amy-Beth is prepared to support and assist Mr. Doyon with his reentry, Mr. Doyon would like to provide day-to-day care for Amy-Beth, who has Multiple Sclerosis and is disabled as a result of a serious car accident.  (PSR ¶¶ 51, 60, 63; Exhibit A at 11; Exhibit B at 1–2.)

Mr. Doyon also has additional plans — he would like to complete and publish his third book, in which he plans to address new topics of interest rather than politics (which his first two books focused on), and he would like to attend Buddhist retreats.  (Exhibit A at 12.)  Mr. Doyon has therefore not only resolved to retire as an activist, but he has also contemplated and made viable plans for a different life.

In deciding upon his sentence, the Court should consider Mr. Doyon's activism in that it demonstrates Mr. Doyon's enduring desire to make the world a fairer and more peaceful place, especially for those who are too often short-changed and forgotten by society at large.  The Court should also take into account that Mr. Doyon's activism has decidedly come to an end, as the price he has already paid for the underlying offenses has contributed to his unequivocal decision

to retire. A sentence of time served and a year of supervision is sufficient to achieve the sentencing objectives given this reality.

### V. A SENTENCE OF TIME SERVED AND ONE YEAR OF SUPERVISED RELEASE IS SUFFICIENT TO ACHIEVE THE OBJECTIVES SET FORTH UNDER 18 U.S.C. § 3553(a)(2) AND (6), AND INCORPORATED BY REFERENCE UNDER 18 U.S.C. § 3583(c).

For the reasons set forth below, a sentence of time served and one year of supervised release is sufficient to achieve the objectives delineated under 18 U.S.C. § 3553(a)(2), and the imposition of this sentence would not contravene the need to avoid unwarranted sentence disparities under 18 U.S.C. § 3553(a)(6). *See* 18 U.S.C. § 3583(c).

    **a.   A custodial sentence of time served would constitute just punishment.**

A custodial sentence of time served is sufficient to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

As to the DDoS and DoS offenses, Mr. Doyon's altruistic motivation distinguishes these offenses, and by extension Mr. Doyon, from the vast majority of criminal offenses and criminal defendants that come before this Court. The underlying conduct was carried out in an attempt to advance the welfare of homeless people and improve the difficult circumstances they face, circumstances which often mean they have little choice but to camp in public parks and go without enough to eat. Without seeking to minimize the seriousness of the DDoS and DoS offenses and the monetary losses they caused, Mr. Doyon also undertook those offenses pursuant to his belief that they represented non-violent acts of civil disobedience. Mr. Doyon has since accepted the illegality of his conduct, and he has retired from the activism that gave rise to it.

Mr. Doyon has similarly accepted responsibility and expressed remorse for his failure to appear and his subsequent period of flight. Mr. Doyon's time as a fugitive was ultimately characterized by unrelenting hardship — he was "stressed and paranoid the entire time," "often hungry, cold and sick," and frequently homeless, including during the seven Canadian winters he spent sleeping on park benches. (PSR ¶ 67; Exhibit B at 2; Exhibit E at 1–2.) Given all of the foregoing circumstances, a custodial sentence of time served is sufficient to provide just punishment.

      **b.** **Mr. Doyon is at low risk of reoffending.**

Because Mr. Doyon is at low risk of reoffending, a downward variance to a sentence of time served and one year of supervision is sufficient to afford adequate deterrence and protect the public. *See* 18 U.S.C. §§ 3553(a)(2)(B)–(C), 3583(c). Mr. Doyon's underlying failure to appear stemmed from the DDoS and DoS offenses. The entire impetus for the DDoS and DoS offenses, in turn, was Mr. Doyon's activism. Mr. Doyon has now unreservedly retired from all activism, having spent years reckoning with the many consequences that stem from the form of activism he took up in the case of the underlying conduct.

There is every reason to believe Mr. Doyon's decision to retire will not change. He is in what he perceives to be "the autumn of his life," as he feels his health beginning to deteriorate after years of inadequate medical care and more than four decades of smoking two packs of unfiltered cigarettes a day. (Exhibit A at 11; PSR ¶ 65.) He wants to spend what will likely be the last phase of his life reconnecting with his sister, healing the wounds of his past, and enjoying the company of his rescue dogs, Xander and Xavier, with whom he has found great happiness and fulfillment. Mr. Doyon also remained law-abiding, and abandoned online activism, during the more than nine years in which he was a fugitive, demonstrating that his commitment to retire from activism is one that he can and will uphold.

Moreover, he has plans for a life post-activism, and these plans are viable. He would like to publish a book, and has already done so twice. (PSR ¶ 73.) He also has a following of loyal supporters who find inspiration in his story and perspective, and these supporters will be a receptive audience for Mr. Doyon's book when it becomes available. (*See* Letter to Ct. from Esteleen Yvonne Westby, appended hereto as Exhibit G; Letter to Ct. from Jade Ross, appended hereto as Exhibit H; Letter to Ct. from Glory Jones, appended hereto as Exhibit I; Letter to Ct. from John Leehane, appended hereto as Exhibit J; *see also* Petition, *Show Mercy to Homeless Rights Activist Commander X*, CHANGE.ORG, https://www.change.org/p/show-mercy-to-homeless-rights-activist-commander-x, appended hereto as Exhibit K (including petition, comments providing selected signatories' "reasons for signing," and table of all signatories).) Given the other channels through which Mr. Doyon can connect with the world and explore his

interests, he is particularly unlikely to resume the offense conduct, and considering all of the foregoing circumstances, the requested sentence is fitting.

### c. Mr. Doyon would not benefit from additional time in custody or a term of supervision in excess of one year.

The need to provide Mr. Doyon with educational or vocational training, medical care, or other correctional treatment does not justify the imposition of further time in custody or a term of supervision that exceeds one year. *See* 18 U.S.C. §§ 3553(a)(2)(D), 3583(c).

Aside from Mr. Doyon's plan to publish further books, his computer programming and hardware operations skills are ones that he can use to find work, (PSR ¶ 71), and these skills make it such that he would not benefit from educational or vocational training that he might receive in a correctional setting. Mr. Doyon has been hired in the past to install a security system that was operative across all of the grocery stores of a Maine-based chain, and this is a type of work he could pursue in the future. (Exhibit D at 1 (describing Mr. Doyon's work for the Thad Barber chain of stores and indicating that the owner "was quite impressed with [Mr. Doyon] and endorsed him for State Representative").)

Mr. Doyon is also not in need of treatment. He has been sober for twelve years, and is therefore not in need of treatment for addiction or substance abuse issues. (PSR ¶ 69.) While Mr. Doyon does have various health concerns, his medical requests have been denied, so there is every indication that his concerns would be better addressed outside of a correctional setting. (PSR ¶ 65; Exhibit F at 2.) It is also apparent that Mr. Doyon's health will almost certainly *decline* if he remains in custody, as "his physical health has deteriorated" during his confinement, and the symptoms of his anxiety and PTSD (which he suffers from as a result of his childhood trauma) "are exacerbated by the conditions in jail" to the point that "suicide has become 'a constant thought'" for Mr. Doyon. (PSR ¶ 66, ECF page 25.)

A term of supervision exceeding one year is also longer than that which is necessary to discharge the objectives of sentencing. At this point, more than ten years have elapsed since Mr. Doyon engaged in the final instance of conduct related to the underlying DDoS and DoS

offenses.  Mr. Doyon also remained law-abiding during the nine years in which he was a fugitive.  Given these circumstances, supervision that extends beyond a year is not warranted.

    **d. The requested sentence would not contravene the need to avoid unwarranted sentence disparities.**

  The requested downward variance would not be at odds with the need to avoid unwarranted sentence disparities among similarly-situated federal defendants.  *See* 18 U.S.C. §§ 3553(a)(6), 3583(c).  The only case in which Mr. Doyon had a co-defendant is case number 11-CR-00683.  Mr. Doyon's co-defendant in that case, Joshua Covelli, was sentenced to one year of probation, which was ultimately terminated early.  (PSR ¶ 8.)  As the PSR notes in providing the justification for the downward variance it recommends, Mr. Doyon has already served a more severe sentence than Mr. Covelli, as Mr. Doyon has now spent more than a year in custody.  (PSR at ECF page 25.)

  Because Mr. Doyon does not have co-defendants in case numbers 12-CR-00426 and 22-CR-00099, the need to avoid sentence disparities is not immediately implicated in those cases.  Moreover, even if Mr. Doyon did have co-defendants in those cases, any disparity resulting from the imposition of the requested sentence as to Mr. Doyon would be warranted on the basis of Mr. Doyon's wholly-altruistic motive for engaging in the underlying DDoS and DoS offenses, the fact that those offenses were undertaken as part of Mr. Doyon's activism, and the fact that Mr. Doyon's activism is at once indicative of his long-standing desire to effect positive social change and, at the same time, something from which he has categorically retired.

## VI. CONCLUSION

For all of the foregoing reasons, and in full consideration of the particular circumstances of the underlying offenses, Mr. Doyon's history and characteristics, and the other goals of sentencing, Mr. Doyon respectfully requests that the Court vary from the applicable guideline ranges and sentence him to a custodial sentence of time served and a one-year term of supervised release.

Dated: June 21, 2022                                        Respectfully Submitted,

                                                            _____
                                                            Jay Rorty
                                                            Attorney for Christopher Doyon